**SO ORDERED.**

**SIGNED this 5th day of February, 2016.**



BENJAMIN A. KAHN
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

| | |
|---|---|
| In re: ) | |
| ) | |
| William Oliver Campbell, ) | Case No. 13-81123 |
| ) | |
| Debtor. ) | |
| ) | |
| —————————————) | |
| ) | |
| Charles M. Friedman and ) | |
| Luceil L. Friedman ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Adversary No. 14-09009 |
| ) | |
| William Oliver Campbell, ) | |
| ) | |
| Defendant. ) | |
| —————————————) | |

MEMORANDUM OPINION
AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT
AND DENYING MOTION TO STRIKE

This adversary proceeding is before the Court on the Motion for Summary Judgment,

filed by Plaintiffs Charles M. Friedman and Luceil L. Friedman ("Plaintiffs") on August 31,

2015 [Doc. # 89] ("Motion for Summary Judgment"), Luceil L. Friedman's Affidavit in Support

of Motion for Summary Judgment [Doc. # 90] ("Friedman Affidavit"), and Plaintiffs'

Memorandum in Support of Motion for Summary Judgment [Doc. # 91] ("Plaintiffs'

Memorandum").  The Defendant filed a timely Response to the Motion for Summary Judgment on October 15, 2015 [Doc. # 98] ("Defendant's Response"), the Affidavit of William Campbell in Opposition to the Motion for Summary Judgment [Doc. # 99] ("Campbell Affidavit"), and the Memorandum in Opposition to the Motion for Summary Judgment [Doc. # 100] ("Defendant's Memorandum").

The Defendant filed a first Amended Affidavit of Defendant William Campbell on October 21, 2015 [Doc. # 101] (the "First Amended Campbell Affidavit"), followed by a Second Amended Affidavit of William Campbell on October 28, 2015 [Doc. # 102] (the "Second Amended Campbell Affidavit").  Plaintiffs moved to strike the Campbell Affidavit, the First Amended Campbell Affidavit, and the Second Amended Campbell Affidavit on October 30, 2015 [Doc. # 103] (the "Motion to Strike").  For the reasons set forth herein, the Court will deny the Motion to Strike and deny the Motion for Summary Judgment.

## BACKGROUND[1]

In 2011, the Plaintiffs began constructing a home on a lot located at 207 High Ridge Lane, Pittsboro, North Carolina (the "Property").  Instead of hiring a licensed general contractor, the Plaintiffs personally managed the construction.  The Defendant approached the Plaintiffs about the prospect of becoming the Plaintiffs' flooring contractor.  The Plaintiffs attempted to perform due diligence and research on the Defendant and the company through which he presented himself as doing business, Select Forest Products, Inc. ("SFP").  The Defendant presented the Plaintiffs with his business card which included a website for SFP.  The version of the website in 2011 was created in 2002.  The Plaintiffs submitted as evidence screen shots of

---

[1] The background set forth below is based upon the documents and deposition testimony offered by the parties in connection with summary judgment.  The background shall not constitute findings of fact or partial summary judgment with respect to any facts set forth herein for purposes of trial.

SFP's website with the Motion for Summary Judgment, which include a description and showing of Canadian White Hard Maple, an "About Us" section that shows a picture with the caption "We bring in thousands of square feet of hardwood flooring to a climate-controlled warehouse," and a tagline stating "Since 1976." [Doc. # 90, p. 15-17]. The Defendant disputes that the website contained this content in 2011. Instead, the Defendant contends that these screen shots were taken from the website as it existed after the website was remodeled in 2012, and not as it looked when the Plaintiffs were first discussing options and deciding whether to hire the Defendant. The Defendant submitted screen shots of the website as he claims it existed in 2011, during the time which the Plaintiffs might have seen the website. Although the tagline "Since 1976" is similarly present on the earlier version of the website, the "About Us" page looks significantly different and makes no reference to a climate-controlled warehouse. [Doc. # 99, Ex. 1B]. The Plaintiffs also claim that the website only listed one type of maple wood, which was "Canadian White Hard Maple." The Defendant admitted in testimony that Canadian Maple was the only type of maple listed on the website, but he also stated that he never represented he only dealt in Canadian Maple and in fact had numerous types of maple other than Canadian Maple on display in his showroom, which samples the Friedmans had the opportunity to view. [Doc. # 99, ¶ 2, 3].

Luceil Friedman reports that she expressed reservations about installing maple flooring at her home but that the Defendant supported using maple. The Plaintiffs aver that the Defendant specifically stated he dealt only with Canadian Maple for its superior quality and tighter grain. [Doc. # 90, ¶ 7, 8]. The Defendant states he never made the statement that he only worked with Canadian Maple, and he offered evidence of discussions with the Plaintiffs about other types of wood, including other maples, and provided evidence that he displayed other types of maple at

3

the show room.  [Doc. # 99, ¶ 3].  The Defendant provided copies of emails between the parties, supporting his contention, and reflecting communications between the parties that contemplated the use and availability of Quartersawn 4" Maple and 5 ¾" engineered maple.  [Doc. # 99-1, Ex. 2].

While the Plaintiffs were deciding whether to hire the Defendant and what type of wood to use in their flooring, the Defendant invited the Plaintiffs to view a recent project he had completed (the "Corn House").  The Plaintiffs state the Defendant represented that the wood at the Corn House was Canadian Maple [Doc. # 90, Friedman Affidavit, ¶ 15].  The Defendant states this recent project was specifically shown to the Plaintiffs because it demonstrated the use of Quartersawn Hard Maple and not Canadian Maple [Doc. # 99, Campbell Affidavit, ¶ 7]. Emails sent between parties after the Plaintiffs viewed the Corn House show that the Plaintiffs were dissatisfied with what they had been shown as an example.  Emails also show the Defendant assured the Plaintiffs that the problem was not the quality or type of wood but that the floor had been improperly installed by installers of whom he did not approve.  The Plaintiffs further contend that the Defendant stated that the project climate at the Corn House was not monitored appropriately [Doc. # 99, Ex. 3], and that he would use his own installers on the Plaintiffs' Property, specifically a man named Perferio Garcia ("Mr. Garcia").  The Plaintiffs aver that the Defendant orally assured them that Mr. Garcia was of the "highest caliber."  [Doc. # 90, Friedman Affidavit, ¶ 16].   The Defendant further advised that the Plaintiffs might look into engineered wood as an option.  Id.  The email does not state when the Plaintiffs visited the Corn House, but it is obvious from emails sent after January 11 that the Plaintiffs had not decided on a wood type yet.  See [Doc. # 99-1, Ex. 2].  Therefore, the emails indicate that the Defendant was giving the Plaintiffs other wood options.

4

In his emails with the Plaintiffs, the Defendant first offers a 3" first grade Canadian Maple by email dated Thursday 29, 2011, [Doc. # 4; Exhibit B] to which the Plaintiffs reply "do you have any 3" samples I can look?" Id.  Defendant replied on December 30 that the Plaintiffs were welcome to come see the samples.  Defendant then sent an email to the Plaintiffs on January 4, 2012, stating "[t]he mill has 3100 sf of the 4" Select Quartersawn 4" Maple in stock. If interest, let me know.  I will send new proposal."  To which the Plaintiffs replied "Yes, we are interested.  Please send the proposal . . . . We are planning to also do the two main house bathroom floors as well.  [Lu] wants to know what you can take off for not using an underlayment."  [Doc. #99-1].  Regardless of the invoices, the evidence on record creates an issue of fact whether the agreement between the parties was for 4" Quartersawn Maple instead of Canadian Maple. In a follow up email dated January 19, 2015, again the numbers and options listed by the Defendant are all for 4" Quartersawn Maple, 3" Plainsawn Maple, or 5 ¾" engineered Maple, but do not mention Canadian Maple. [Doc. # 99-1].  Finally, an email from Defendant to Plaintiffs on Wednesday January 25, 2012, states the flooring quote is "2768 sf 4" quartersawn Maple @ 5.75 sf tax included." [Doc. # 99-1].

At some point while discussing options, viewing examples of the Defendant's work, and discussing estimates, the Plaintiffs hired the Defendant as flooring contractor.  The parties had a verbal contract concerning the work to be performed.  Both parties disagree as to what the agreement said about the type of material to be used: the Plaintiffs state they had an agreement for use of Canadian Maple, and the Defendant states the agreement was for Quartersawn Maple. Prior to initiating the work, the Plaintiffs paid Defendant twice: once on February 23, 2012, in the amount of $17,000 and once on March 5, 2012, for $677.80 in payment of an invoice issued January 23, 2012 ("First Invoice") for 2,880 square feet of Floor Maple 4" Quartersawn

Canadian Hard White Maple.  SFP issued a second invoiced on March 20, 2012, for wood flooring installation, trim, and sales tax (the "Second Invoice").  The Plaintiffs paid this invoice in the amount of $4,218.69 on April 1, 2012.  The wood ultimately used at the Property was not 4" Quartersawn Canadian Hard White Maple.  The Defendant asserts that he understood the agreement to be for installation of 4" Quartersawn hard maple of Select/1st grade.  [Doc. # 99, ¶ 21].  The material ordered was ¾ x 4" 1st Grade Rift & Quarter Hard Solid Maple Flooring. [Doc. # 90].

During installation, the Plaintiffs contacted the Defendant about alleged defects in the hardwood flooring, alleged defects in the installation, and alleged defects in the milling of the flooring.  Initially, Defendant and the Plaintiffs communicated about the reported issues, but communication eventually broke down.  The Defendant was concerned with the alleged defects, and told the Plaintiffs he would remedy the problems as needed.  The Defendant reportedly stated, in a voicemail concerning alleged installation problems, that Mr. Garcia "didn't understand" how to install maple [Doc. # 90, ¶ 16].  Impatient with the length of time it was taking to address their concerns, the Plaintiffs obtained two flooring inspections of the Property. The Defendant obtained his own independent inspection.

The Plaintiffs allege that the two inspections they obtained show that the flooring installed was of inferior quality, mismilled, and not installed according to industry standards. [Doc. # 90, ¶ 36].  For purposes of their motion for summary judgment, the Plaintiffs offered the inspection from George L. Palmer (the "Palmer Inspection"), which determined that gaps in the flooring were from poorly milled wood, and that creaking and moving of the flooring were due to faulty fastening schedules that do not meet standards.  [Doc. # 4, Ex. F].  Plaintiffs also submitted the inspection performed by Tucks Floor Service (the "Tucks Inspection"), which

concluded the wood flooring installed was not select quality and is not installed by industry standards. [Doc. # 4, Ex. F]. In opposition to the motion, Defendant offered an inspection from Consult Inspect Design, Inc., (the "Consult Inspection") that indicated the project appeared incomplete, the mismilled wood made up less than 5% of the wood used, and any problems appeared to be a result of the failure of the Plaintiffs to correctly monitor the environment of installation. [Doc. # 99, Ex. 9].

The Defendant and SFP filed suit against the Plaintiffs for an unpaid invoice dated May 4, 2012, for a millwork package, treads, risers, and trim in the amount of $7,787.36, which was later reduced to $6,104.25. SFP also filed and served a Claim of Lien on Real Property encumbering the Property for the materials and labor for which SFP claimed it had not yet been paid. Due to medical issues, the Plaintiffs deeded the Property to their son, Robert A. Caplen on March 30, 2012.

Plaintiffs then decided, "having no choice," to remove all of the flooring installed by the Defendant and replace it with new flooring, spending approximately $44,000 ($3,300 of which was the cost of having the old flooring removed). [Doc. # 90, ¶ 47]. During this removal, the Plaintiffs assert that they noticed further defects in the flooring. The Plaintiffs have been storing the removed flooring in a storage unit for $75.00 per month, for a total cost of $2,925.00 as of September 1, 2015. Plaintiffs also contend that the defects caused them to take additional time constructing their home, causing them to incur expense of carrying two properties simultaneously for approximately three months longer than expected.

The Defendant filed for bankruptcy on September 5, 2013 [Case No. 13-81123]. The Defendant listed the Plaintiffs in Schedule F of his petition as holders of an unsecured, non-priority, and disputed claim in the amount of $40,000. The Plaintiffs filed this adversary

proceeding on February 7, 2014, asking the Court to find the debt owed to Plaintiffs by the Defendant to be non-dischargeable under Section 523(a)(2)(A), alleging the Defendant's fraudulent actions allowed him to obtain significant funds from the Plaintiffs by false pretenses, false representations, and actual fraud.

## STANDARD OF REVIEW

Summary judgment is appropriate when the matters presented to the Court "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In considering a motion for summary judgment, the Court must construe the "facts and inferences drawn therefrom in the light most favorable to the nonmoving party." Seabulk Offshore, Ltd. v. American Home Assur. Co., 377 F.3d 179, 183 (4th Cir. 2001). The party moving for summary judgment has the initial burden of proving the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits. Celotex, 477 U.S. at 323. Once this initial burden has been met, the nonmoving party must then set forth specific facts sufficient to raise a genuine issue for trial. Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

The Court also may consider any evidence in the record or submitted by the parties if it would be possible to introduce the evidence at trial. See Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible into evidence."); see also Celotex, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."). What matters is not that the parties submit evidence in support or opposition to the motion in an admissible form but that the "substance or content of the evidence

. . . be admissible . . . ." 11 James Wm. Moore et al., <u>Moore's Federal Practice</u> ¶ 56.91[2] (3d ed. 2014).  Moreover, if a party fails to object to the inadmissibility of evidence offered in support of a motion for summary judgment, the Court may deem any objection to admissibility waived and consider the evidence.  <u>See</u> Fed. R. Evid. 103(a); <u>see also</u> Local Rule 7056-1(c) ("All facts set forth in the statement of the movant shall be deemed admitted for the purpose of the motion for summary judgment unless specifically controverted by the opposing party.").

## CONCLUSIONS OF LAW

### a.  Motion to Strike

Plaintiffs move to have the Campbell Affidavit, First Amended Campbell Affidavit, and Second Amended Campbell Affidavit stricken in full or in part pursuant to Federal Rules of Civil Procedure 12(f) and 56(c)(2), 56(c)(4), 56(e), 56(f), and 56(h) for the following reasons:  (1) the Amended Affidavits were submitted beyond the established deadline to respond; (2) multiple paragraphs of the Campbell Affidavit and Amended Affidavits testify regarding matters that Plaintiffs argue go beyond the Defendant's personal knowledge; and (3) portions of the Campbell Affidavit and Amended Affidavits are in conflict with earlier testimony and should be disregarded as sham affidavits. [Doc. # 103].

Motions to strike are no longer proper procedure under Federal Rule of Civil Procedure 56. 12 James Wm. Moore et al., Moore's Federal Practice ¶ 56.91[4] (3d ed. 1997).

> Prior to 2010, motions to strike were often used to object to defective supporting materials.  However, this is no longer the proper procedure.  Rule 56(c)(2)…calls for a simple 'objection' to summary judgment evidence that cannot be presented in a form that would be admissible at trial.  The drafters of the 2010 amendments to Rule 56 have stated: "There is no need to make a motion to strike."  A court should disregard inadmissible evidence instead of striking it from the record, as was done with a formal motion to strike.

<u>Id.</u>

The First Amended Affidavit and Second Amended Affidavit appear to be identical to the affidavit timely filed with Defendant's Memorandum with the exception of a change of the title to reflect each amendment. Therefore, the Court will disregard the First Amended Affidavit and Second Amended Affidavit as "redundant" pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.[2]

Plaintiffs further moved to have the Campbell Affidavit stricken in its entirety for bad faith pursuant to Rule 56(h), alleging it is a "sham" in conflict with earlier deposition testimony. [Doc. # 103, ¶ 22]. The Court has reviewed the Campbell Affidavit and the testimony to which the Plaintiffs cite and finds no contradiction rising to the level of a sham intended to create "trial by ambush." The Defendant's previous testimony indicated that he had never checked his assumption that the warehouse used to store materials was climate-controlled. The relevant part of the Campbell Affidavit asserts the warehouse was never referred to as climate-controlled, that he was open about the warehouse, having invited the Friedmans to come to the warehouse upon delivery to inspect the material, and that the warehouse referred to in the website submitted as evidence by the Friedmans was not in existence at the time of their business dealings. Enough questions exist concerning what was communicated and what was known by the Plaintiffs to prevent the Defendant's statement from being a sham meant to ambush the Plaintiffs at trial. The Defendant's claim that he failed to verify the status of the warehouse is not the only issue of

---

[2] Plaintiffs also move to strike the Amended Affidavits as they are untimely. The Court already has ruled it is appropriate to disregard the Amended Affidavits as being redundant. In any event, the Court notes that untimeliness is not a reason for striking an affidavit under 12(f) of the Federal Rules of Civil Procedure. Plaintiffs cite to Beaufort Concrete Co. v. Atlantic States Const., 352 F.2d 460 (5th Cir. 1965) to show that an untimely affidavit should be stricken. In these cases, however, the affidavits were made three years before the hearing and were presented to the court only at the date of the hearing. Further, Plaintiffs cite Farina v. Mission Inv. Trust, 615 F.2d 1068, 1076 (5th Cir. Tex. 1980) to show a court is not required to extend time to allow a party to submit an affidavit past a deadline absent a showing of excusable neglect under Rule 6(b). However, Rule 6(b) also allows a court to extend the time within which to file an affidavit, with or without a motion, giving great discretion to the court. Because the Court has disregarded the Amended Affidavits, it is unnecessary for the Court to determine whether to strike the Affidavits as untimely.

material fact,[3] and the Campbell Affidavit does not appear to be conceived as a sham merely because of the Defendants attempts to both refute that any misrepresentations were made as well as assert that he did not truly know the status of the warehouse.  A determination of which explanation is correct, and whether it even affects the Plaintiffs' claim, is best suited for trial, and therefore the Court will not disregard the Campbell Affidavit in its entirety.

Rule 56(e) allows a party to object when the opposing party fails to properly support an assertion of fact in a brief opposing a summary judgment motion.  Rule 56(c)(2) states that a party may object to material cited in support or in opposition to a motion for summary judgment if the material cannot be presented at trial in a form that would be admissible.  All but one of the statements to which the Plaintiffs object could be presented by the Defendant in a form that would be admissible at trial upon his own testimony, assuming he lays a proper foundation for personal knowledge.

The remaining objections to the Campbell Affidavit were made pursuant to Rule 56(c)(4) which states an "affidavit or declaration used to support or oppose a motion must be made on personal knowledge . . . ."  The Plaintiffs have objected that statements in the first paragraph of the Campbell Affidavit concerning the specific time period within which the Friedmans were conducting "due diligence."  The Court and the Defendant have been made aware of the time period within which the Plaintiffs were conducting "due diligence" because the Motion for Summary Judgment states on page three, "[b]efore the Friedmans agreed to hire SFP as their flooring contractor, they attempted to perform their due diligence and research . . . ."  That reference provides sufficient information for the Defendant and the Court to form a time frame for the Defendant's assessment in paragraph 1 of the Campbell Affidavit.

---

[3] The Court cannot determine, based upon the record before it, whether it is material that the warehouse was or was not climate-controlled.

The Plaintiffs state the following additional statements in Campbell's Affidavit are beyond the knowledge of the Defendant and improper in an affidavit opposing summary judgment:

1)  Statements concerning what Mrs. Friedman was "aware of" in Paragraph 1 of the Campbell Affidavit;

2)  Statements that suggest what the Friedmans were aware of regarding different species of wood offered by the Debtor's business;

3)  Paragraph 21 of the Campbell Affidavit; and

4)  Statements in paragraph 23 of the Campbell Affidavit testifying as to the type of wood the Friedmans believed they were receiving.

The majority of these statements purport to explain what the Plaintiffs were "aware of." The Court interprets statements as to what the Plaintiffs were "aware of" to represent what Mr. Campbell believed the Plaintiffs were aware of based upon his conversations with them. The Defendant would have personal knowledge of what he showed the Plaintiffs, what he told the Plaintiffs, what information he made available to the Plaintiffs, and the statements made by the Plaintiffs themselves, which statements are not hearsay under Rule 801(d) of the Federal Rules of Evidence. For example, the Defendant specifically states that he told the Plaintiffs he had lived in Florida in the 80's and 90's (Affidavit ¶ 1). This is a specific fact, which construed in a light most favorable to the Defendant, supports his contention that the Plaintiffs knew he had not been in business as SFP since 1976. Nevertheless, with respect to more generalized and unsupported statements of the Plaintiffs' knowledge, if these statements formed the sole basis for denying the Plaintiffs' motion for summary judgment, the Court likely would find them sufficiently unspecific to create a material issue of fact due to the lack of specificity of the origin of these conclusions by the Defendant. For this reason, the Court has disregarded any of these conclusory statements of the Plaintiffs' knowledge. Regardless, in this case, the Plaintiffs'

motion fails for reasons unrelated to any of these more conclusory statements of knowledge in the affidavit.

The Court will disregard, for the purpose of summary judgment, Paragraph 8 of the Campbell Affidavit, listing parties whom the Defendant alleges the Plaintiffs have not previously paid for work performed. The Campbell Affidavit does not lay a foundation or a basis of personal knowledge, does not cite to any source, and therefore will not be considered pursuant to Rule 56(c)(4) and (e). The remainder of the Campbell Affidavit will be considered as discussed in evaluating the Motion for Summary Judgment.

### b.  Dischargeability Under 11 U.S.C. 523(a)(2)

Section 523(a)(2) excepts from the debtor's discharge the liability for any <u>debt</u>:

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –

> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . .

11 U.S.C. § 523(a)(2) (emphasis added). The elements necessary to establish false pretenses, a false representation, or actual fraud under Section 523(a)(2) are: (1) that the debtor made a representation; (2) that the debtor knew the representation was false at the time it was made; (3) that the debtor intended to deceive the creditor; (4) that the creditor relied on the representation; and (5) that the creditor sustained a loss as a result of that reliance. <u>In re Casper</u>, 466 B.R. 786, 793 (Bankr. M.D.N.C. 2012); <u>In re Highfill</u>, 336 B.R. 701, 706 (Bankr. M.D.N.C. 2006).

### 1.  The Debt

Although Section 523 lists those types of debt that will be excepted from a debtor's discharge, the exception to discharge itself does not make a debtor liable to a creditor. <u>See In re Eisaman</u>, 387 B.R. 219 (Bankr. N.D. Ind. 2008). That existing liability generally must be

established under non-bankruptcy law.  See id.  In determining the existence and amount of the

debt, the bankruptcy court must apply relevant state law.  In re Janssens, 449 B.R. 42 (Bankr. D.

Md. 2010), judgment aff'd, 2011 WL 1642575 (D. Md. 2011).

Plaintiffs have not included in their brief in support of the motion for summary judgment

any theory of liability under non-bankruptcy law.  Plaintiffs filed this action requesting that the

Court find some obligation owed to Plaintiff by the Debtor to be non-dischargeable under 11

U.S.C. § 523(a)(2).  Based upon their reliance upon Section 523, the context of their brief, and

the allegations in the Complaint, and for purposes of summary judgment, the Court will construe

the underlying state law claim supporting an exception to discharge under 11 U.S.C. § 523(a)(2)

as actual fraud.[4]  To establish a claim for fraud under North Carolina law, a plaintiff must show:

(1) false representation or concealment of a material fact; (2) reasonably calculated to deceive;

(3) made with intent to deceive; (4) that does in fact deceive; and (5) results in damage to the

injured party.  Solum v. Certainteed Corp., No. 7:15-CV-114-D, 2015 WL 7889326, at *6

(E.D.N.C. Oct. 27, 2015) (citing Forbis v. Neal, 361 N.C. 519, 526–27, 649 S.E.2d 382, 387

(2007)).

In their brief, the Plaintiffs assert various alleged misrepresentations as follows: (a) that

the Defendant represented that SFP had been in business since 1976, when the corporate entity

had been administratively dissolved and only had existed since 1997 [Doc. # 90, Friedman

Affidavit, ¶ 14]; (b) that the defects in the floor at the home to which he took them to review his

---

[4] The Plaintiffs continue to complain of defects in workmanship or the failure to meet industry standards in installation.  These claims neither rise to the level of fraud under North Carolina law, nor would such liability be non-dischargeable under 11 U.S.C. § 523(a)(2).  Failure to fulfill a contractual obligation by itself does not establish a misrepresentation for purposes of § 523(a)(2)(A). A breach of contract, even if intentional, is not necessarily a misrepresentation for purposes of § 523(a)(2)(A).  3 COLLIER ON BANKRUPTCY ¶ 523.08 at 523–54 (15th Ed.1994); Keeling v. Roeder (In re Roeder), 61 B.R. 179 (Bankr.W.D.Ky.1986).  The Defendant must have known the representation he made was false at the time he was making it.  Regardless, even if contract claims could form the basis for a non-dischargeability claim, the Plaintiffs have not attempted to establish, and have not established, for purposes of summary judgment any liability of the Defendant under any other basis of North Carolina law, including without limitation breaches of warranty, contract, or workmanship.

work were caused by installation defects, rather than wood quality [Doc. # 90, Friedman Affidavit, ¶ 15]; (c) that Mr. Garcia was of the "highest caliber" as an installer [[Doc. # 90, Friedman Affidavit, ¶ 15]; (d) that the Defendant represented the wood sold to the Plaintiffs was Canadian Maple, when it was in fact an inferior grade of maple [Doc. # 90, Friedman Affidavit, ¶ 36]; (e) that the Defendant stored the wood for the Property at a climate-controlled warehouse [Doc. # 90, Friedman Affidavit, ¶ 19]; and (f) that the humidity was "ideal" at the Property [Doc. # 90, Friedman Affidavit, ¶ 22].

**a.  False Representation Concerning a Material Fact**

In order to be the type of representation upon which a claim for fraud may be based in North Carolina, the representation must be false and must be material.  Mere "puffery, or an exaggerated statement which no reasonable buyer would be justified in relying on or a claim of superiority so vague that nothing can be understand from it except that it is an opinion," cannot be a basis for common law fraud in North Carolina.  See Solum, at *5 (and cases cited therein) (representations made on a website concerning a company's designation of "Master-Craftsman" that implied those craftsmen designated were highly prestigious or put through rigorous examination and credentialing was puffery); McKee v. James, No. 09 CVS 3031, 2014 WL 7534078, at *10 (N.C. Super. Dec. 31, 2014) (where defendant "misrepresented himself as an experienced, sophisticated investor, who sought to use his resources and experience to restore McKee Craft to profitability," with no other evidence, was immaterial puffery).  Construing the facts in a light most favorable to the non-movant Defendant, the Court cannot determine that the Defendant's statements regarding the length of time that the corporation had been in existence, as opposed to the length of time that the Defendant himself has been engaged in wood work and flooring, is not similarly indefinite and immaterial puffery.  The Defendant contends that his

personal experience in the business dated back thirty years.  [Doc. # 99, ¶1]  To the extent that the Defendant had similar temporal experience in hardwood flooring, such a representation could be akin to holding oneself out as a "sophisticated investor," and no more indicative of ability than claims that craftsmanship status is "highly prestigious." The Court will have to consider these statements in light of the evidence adduced at trial to determine whether they may form the basis of a fraud claim under North Carolina law.  Nevertheless, regardless of context, the claim that Mr. Garcia was of the "highest caliber" cannot form the basis for a fraud claim.  This is precisely the type of indefinite puffery that insufficient for purposes of fraud in North Carolina.

In addition to being material, a representation also must be false.  Plaintiffs claim they were deceived by the Defendant's statements that defects in the floor at the Corn House were caused by installation defects, rather than wood quality.  The wood used at the home was purportedly the same wood that the Plaintiffs were considering using on their Property.  The Plaintiffs argue that Defendant represented that the wood was Canadian maple.  [Doc. # 90, Friedman Affidavit, ¶ 15].  The Plaintiffs claim to have expressed concern that the "wood edges were curling upward."  Id.  The Plaintiffs allege the Defendant represented that the homeowners had purchased the wood from him but did not use his installers, who were superior to the ones used by the homeowners, and had not properly dehumidified the space beneath the floor.  Id. The Campbell Affidavit, on the other hand, insists the wood viewed at the home was 4" select/1st grade rift & quartersawn hard maple and was never stated or suggested to be Canadian maple. [Doc. # 99, ¶ 7].  In an email dated January 11, 2012, the Defendant wrote to Luceil Friedman and expressed his opinion that the "disappointing," "maple floor" at the home viewed was a "classic example of a homeowner rushing an installation before the basement (i.e. crawl space) was acclimated." [Doc. # 99-1, Ex. 3].

The Plaintiffs have put forth no evidence that would tend to conclusively demonstrate for purposes of summary judgment that the Defendant's statement concerning the reasons for the wood "curling upward" was due to the quality of the wood, or that the quality issues at the Corn House were a result of the wood not being Canadian.  In order for the representation to be a basis for fraud, it must be shown to be false.  There is a genuine question of fact for trial whether the representations made at the Corn Home were material, but there also is a question of their falsity.

Finally, the Defendant's evidence offered in opposition to the motion is sufficient to create a disputed issue of fact whether the parties actually agreed that the Defendant would supply and install Canadian Maple at the Plaintiff's home.  Therefore, even if the wood provided by the Defendant was inferior to Canadian Maple, whether the Defendant misrepresented the type of wood he had ordered and installed, is disputed.

The record before the Court is insufficient to conclusively determine whether the representations of which the Plaintiffs complain are material, false, or were ever even made.  Nevertheless, even if these were the types of statements upon which claims for fraud could be based in North Carolina, the Defendant has submitted sufficient evidence to create material issues of fact for trial regarding the content and existence of the statements that Plaintiffs attribute to him.

**b.  Reasonably Calculated to Deceive, and Made with the Intent to Deceive**

Summary judgment is generally inappropriate in an action alleging fraud because intent is normally a state of mind proven by circumstantial evidence.   Bolick v. Townsend Co., a Subsidiary of Merrill Lynch Realty Associates, 94 N.C. App. 650, 652, 381 S.E.2d 175, 176 (1989) (citing Bank v. Belk, 41 N.C.App. 328, 255 S.E.2d 430, disc. rev. denied, 298 N.C. 293, 259 S.E.2d 299 (1979)).

The Plaintiffs' Motion for Summary Judgment points to no direct evidence of the Defendant's state of mind that shows he intended to deceive the Plaintiffs. [Doc. # 91, ¶ G]. The Motion for Summary Judgment asks the Court to find intent to deceive from circumstantial evidence, claiming the only possible purpose behind the Defendant's actions would be to deceive the Plaintiffs and induce them into a contract. Id. The Court disagrees. The Defendant has stated in affidavit and in deposition that he did not intend to deceive the Plaintiffs, that there was never an agreement to sell Canadian maple to the Plaintiffs; that any display of Canadian maple was left from past projects but not presented to make Plaintiffs believe that would be the wood they would purchase; and that he showed the Plaintiffs a sample of wood at the Corn's House that was not Canadian maple.

In opposition to the motion, there is some evidence to suggest the Defendant did intend to mislead the Plaintiffs. The Defendant, at one point prior to a final agreement, offered to put on hold a certain amount of 3" Canadian maple on December 29, 2011, but ordered "3/4 x 4" 1st Grade Rift & Quarter Hard Maple Solid Flooring" on December 30, 2011 [Doc. # 4, Taylor Lumber Invoice, P.O. Number Friedman]. There is no other evidence that the order on December 30, 2011, was reflecting the promise made on December 29, 2011. Email communications after this date do not specifically state any agreement for Canadian maple and in fact discuss other flooring options. Although these emails and invoices might tend to suggest the Defendant intended never to provide Canadian maple regardless of the parties' final agreement, they are insufficient to conclusively establish that intent at summary judgment. Viewing the evidence, including the affidavits of both parties, in light most favorable to the Defendant, the Court cannot determine intent of the Defendant without making credibility judgments and evaluating circumstantial evidence. Therefore, summary judgment is inappropriate.

### c.  Reliance

In North Carolina,

[a]ctual reliance is demonstrated by evidence plaintiff acted or refrained from acting in a certain manner due to defendant's representations.  <u>Libby Hill Seafood Restaurants, Inc. v. Owens</u>, 62 N.C.App. 695, 698, 303 S.E.2d 565, 568, <u>disc. review denied</u>, 309 N.C. 321, 307 S.E.2d 164 (1983). Moreover, plaintiff's reliance upon the false representations must be justified or reasonable.  <u>Johnson v. Owens</u>, 263 N.C. 754, 757, 140 S.E.2d 311, 313 (1965).

<u>Pleasant Valley Promenade v. Lechmere, Inc.</u>, 120 N.C. App. 650, 663, 464 S.E.2d 47, 57 (1995).  The standard of reliance for actual fraud under North Carolina law, however, differs from justifiable reliance under 11 U.S.C. § 523(a)(2)(A).  Under § 523(a)(2)(A), the standard for justifiable reliance imposes a lower standard on plaintiffs, and is "a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases."  <u>Field v. Mans</u>, 516 U.S. at 71 (quoting Restatement (Second) of Torts, § 537 (1976)).  A person must, however, "use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation."  <u>Id.</u>

In North Carolina, a party relying upon a misrepresentation in North Carolina must show that he could not have discovered the facts upon inquiry or that he was prevented the opportunity to learn those facts.  <u>Harding v. Southern Loan & Ins. Co.</u>, 218 N.C. 129, 10 S.E.2d 599 (1940); <u>Oberlin Capital, L.P. v. Slavin</u>, 147 N.C. App. 52, 554 S.E.2d 840 (2001) (complaint for fraud was deficient where the plaintiff could have learned the true facts upon inquiry, but the complaint did not allege that the plaintiff was denied the opportunity to investigate).  In contrast, a dischargeability plaintiff may

justifiably rely upon a misrepresentation even if the fraud would have been detected if

there had been an investigation.   In re Vetal, 433 B.R. 524, 531 (Bankr. D.Md. 2010)

(citing Field v. Mans, 516 U.S. at 72, 116 S.Ct. at 437)).    Moreover, in North Carolina,

reasonable reliance rarely is appropriately determined at summary judgment.

> The reasonableness of a party's reliance is a question for the jury, unless the facts
> are so clear that they support only one conclusion.   Marcus Bros. Textiles, Inc. v.
> Price Waterhouse, LLP, 350 N.C. 214, 225, 513 S.E.2d 320, 327 (1999); see also
> Johnson, 263 N.C. at 758, 140 S.E.2d at 314 (observing that "[j]ust where reliance
> ceases to be reasonable and becomes such negligence and inattention that it will,
> as a matter of law, bar recovery for fraud is frequently very difficult to
> determine.").

Forbis v. Neal, 361 N.C. 519, 527, 649 S.E.2d 382, 387 (2007).

Whether the Plaintiffs reasonably relied on any alleged misrepresentation is disputed.

The Defendant states that, with each alleged misrepresentation, the Plaintiffs either had

knowledge or ability to clarify any misinformed assumption: the Defendant recalls conversations

with the Plaintiffs in which he describes his work history, noting he recently lived in Florida and

therefore could not have been operating SFP since 1976 [Doc. # 99, Campbell Affidavit, ¶ 1]; he

states there were numerous kinds of woods, including different types of maple, on display in his

show room and on the SFP website [Doc. # 99, Campbell Affidavit, ¶ 2,3]; and he invited the

Plaintiffs to visit his warehouse, so they could have verified it was or was not climate-controlled.

[Doc. # 99-1, Ex. 4].

The Plaintiffs visited the Corn House in which the Defendant previously installed the

same wood they were considering using.   The Plaintiffs observed and discussed the issues and

problems with the wood.   The SFP website submitted in the Plaintiffs Motion for Summary

Judgment states Canadian white hard maple qualities, including "Density [that] makes machining

difficult," and requires "[e]xtra care . . . be taken during sanding and finishing" [Doc. # 90].   All

of these facts create an issue for trial as to whether reliance was actual and reasonable under North Carolina law.

### d. Damages

Even if the Plaintiffs had established the other elements of fraud for purposes of summary judgment, the itemization of purported damages is insufficient to determine whether those were the result of the Plaintiffs' reliance upon any purported misrepresentations. As explained above, the Defendant's alleged actions of humidity measurements at the Property and reportedly telling the Plaintiffs that the humidity was "ideal" and the same as the "climate-controlled" warehouse at which the wood was previously stored were not material misstatements of fact which would support a claim for fraud under North Carolina law. Regardless, there is no evidence that any alleged false representation concerning the moisture and humidity levels at the Property or the warehouse caused any of the alleged damage. The Plaintiffs' own evidence belies such a contention. The Plaintiffs submitted evaluations performed by two investigators. Neither of these investigators concluded that any alleged defects or damage occurred due to poor moisture and humidity levels at either the warehouse or the Property. The Palmer Inspection Report states, "Although the house interior was slightly outside of industry for relative humidity (60 vs. 50%) this was probably affected by the rain. Also, there was no evidence of high moisture content in the flooring. The uniformity of moisture content between the flooring, subfloor and joists was within industry standards and was far better than I have seen in other installations that had no moisture problems." The Palmer Inspect Report states no conclusion of damage or defect related to moisture or humidity. The Tucks Inspection Report measured the relative humidity at 45% at 68 degrees Fahrenheit and stated, "This is within the recommended environmental range the wood industry recommends wood flooring be maintained or installed; and also is consistent

with the history of prior installation conditions Mrs. Friedman reported in her narrative."  The summary evaluation within the Tucks Inspection Report concludes that there were problems with wood quality and installation practices, but not storage or humidity issues.  The only evidence before the Court that would tend to suggest some alleged defects may have resulted from humidity levels comes from the Defendant's submission of the Consult Inspect Design, Inc., Inspection.  Also taking moisture evaluations, the Consult Inspection noted that the "use of de-humidifiers appears to have caused a moisture imbalance between tops and bottoms of boards.  Many gaps may have already closed up if job site had proper environmental controls as guidelines dictate.  This is the responsibility of the General Contract (In this case the [Plaintiffs are] acting as the General Contractor)."  The only conclusions from all three investigations referring to moisture issues are related to the change of the environment by the Plaintiffs in a method that did not comport with standards.  As such, the Court finds there is no evidence that any reliance on a representation made by the Defendant concerning a "climate-controlled" warehouse or "ideal" moisture and humidity contents of the Property led to any damages at the site.

Furthermore, even if the Plaintiffs could recover contract or warranty damages for purposes of a dischargeability action, the Plaintiffs have drastically overreached with their alleged damages.  Plaintiffs assert damages for the original contract price _and_ the cost to have a replacement floor installed.  Even if the entire cost of replacement were caused by fraud, which has not been established for purposes of summary judgment, to award the original contract amount _and_ replacement cost is double recovery, putting the Plaintiffs in a position better than they would be had the floor been installed as contracted.  If the Plaintiffs could recover all the amounts they expended, the Plaintiffs would have a fully installed floor at no cost whatsoever.

### 2.  Material Misrepresentation Under 11 U.S.C. § 523(a)(2)

Even if the motion for summary judgment established an underlying debt based upon fraudulent misrepresentation in North Carolina, they have not established that any claim is non-dischargeable under § 523(a)(2).  As under North Carolina law, in order to support a claim for non-dischargeability, a debtor's false representation must be material.  Field v. Mans, 516 U.S. 59, 68, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).  A false representation is material if it is considered sufficiently important to influence a plaintiff's decision to enter into business with a defendant.  Id.

The materiality of statements that would support a claim for false misrepresentations under Section 523 are similar to those required for any underlying fraud claim pursuant to North Carolina law.  For the reasons set forth above under North Carolina law, many of the purported representations made by the Defendant are insufficiently definite or material to form the basis for a material misrepresentation under 11 U.S.C. § 523(a)(2).

The remaining disputed representations by the Defendant are: (1) that the reasons for the problems at the Corn House were the installation and not the quality of the wood; (2) that the Defendant used a climate-controlled warehouse for storage; and (3) that the Defendant only sold, and the Plaintiffs were paying for, Canadian maple.  For the reasons set forth above, the Defendant has sufficiently created material issues of disputed fact with respect to whether the Defendant made each of these representations, whether the Plaintiffs actually relied upon them, whether any reliance was reasonable or justifiable, and whether any reliance caused any damages.

Plaintiffs have cited cases in which courts have found material misrepresentations were made when the defendants falsely represented business status and ability to perform the work proposed.  The facts in the cases relied upon by the Plaintiffs are far more egregious than any

alleged misrepresentations here and go to the heart of the materiality standards for misrepresentations and the reasonableness of reliance. In <u>Santiago v. Hernandez (In re Hernandez)</u>, 452 B.R. 709 (Bankr. N.D. Ill. 2011), the defendant represented himself as a fully licensed general contractor for their home project. <u>Id.</u> at 716. Instead, the defendant had no formal home repair training and had at most only two years of experience related to the construction trade. <u>Id.</u> at 713. He learned work from one gentleman, did "handiwork," and was self-employed. <u>Id.</u> The amount of work to be performed involved complete gutting of two floors of the house and the defendant proposed to apply and obtain all permits and create all architectural plans. <u>Id.</u> at 723. "Gutting" involved "all the mechanicals, which is the plumbing, electrical, heating, and air." <u>Id.</u> at 713. In <u>Ward Family Foundation v. Arnette (In re Arnett)</u>, 454 B.R. 663 (Bankr. N.D. Tex. 2011), the defendant represented that, through his companies, he had completed over $10,000,000 in residential transactions, had purchased thirty to forty properties in 2005, and was on track to acquire fifty-plus properties in 2006. <u>Id.</u> at 685. None of these statements were true. <u>Id.</u> In fact, the defendant was in desperate need of an investor because he had been unable to repay earlier investors, pay for repairs on previously purchased properties and had failed to pay taxes on previously purchased properties. <u>Id.</u> at 676. Regardless of the level of egregiousness present, both of these cases went to trial on the misrepresentations and were not decided on summary judgment.

Plaintiffs claim the Defendant made misleading statements about providing Canadian maple for the Property and continued to mislead them that the materials provided were actually Canadian maple, specifically referring to the wood on his invoices as Canadian maple. The Defendant states the invoices were made in error without his knowledge and that he never contracted to provide Canadian maple flooring. Emails between Defendant and Plaintiff

regarding the wood to be supplied refer to the wood as quartersawn 4" maple, without any reference to "Candadian."

Luceil Friedman avers in her affidavit that the wood offered, shown, and invoiced was Canadian maple. The evidence is sufficient to create a material issue of fact whether there was an agreement on Canadian maple or whether there was an agreement on another type of wood. The invoices provide that Canadian maple was sold to the Plaintiffs. The Plaintiffs allege the Defendant reviewed the invoices and knew Canadian maple had not been used, so the invoice itself is conclusive evidence that the Defendant misrepresented that he was supplying Canadian maple. [Doc. #90, Friedman Affidavit, ¶ 24]. The Defendant states his wife did all of the invoices and he remained unaware of the mistakes in the invoices until litigation. [Doc. #99, Campbell Affidavit, ¶ 5]. In any event, when viewed in a light most favorable to the nonmoving Defendant, there is sufficient evidence to create a material issue of fact whether the parties agreed specifically on Canadian maple, whether that representation was material, and whether that representation, even if made, material, untrue, and justifiably relied upon, caused any of the purported damages.

Plaintiffs also assert that the Defendant, through SFP's website, misrepresented that materials were being stored in a climate-controlled warehouse. In his deposition, Defendant stated he did not verify that the space was climate-controlled; he had been told by the landlord and believed that it was so [Doc. # 3, p. 20-21]. The Defendant also rejected the claims that he asserted the warehouse was climate-controlled or attempted to hide from the Plaintiffs that the warehouse was not climate-controlled. Again, whether the Plaintiffs ever were told the warehouse was climate-controlled at a time relevant to the decision to hire the Defendant, whether such a representation was of a nature to induce the Plaintiffs to hire the Defendant, or

whether such a representation had any causal connection whatsoever to any damages remain questions for trial. Therefore, summary judgment is inappropriate.

### 3. Knowledge the Representation was False

There is a material issue of fact whether the parties agreed to use a particular wood grade and Canadian maple (as opposed to maple of the same species, but not Canadian sourced). The Defendant concedes that he knew he was not giving the Plaintiffs Canadian maple. There is a dispute, however, whether the parties agreed to Canadian maple, whether the Plaintiffs believed they were getting Canadian maple, and whether it even mattered that the wood was not Canadian. Although invoices evidence Canadian maple, the Defendant asserts that was not the agreement, and the email exchanges between the parties discussing other types of maple and the Campbell Affidavit are sufficient to create a material dispute regarding these issues. [Doc. # 99, ¶ 7].

Although the Defendant should have known whether his warehouse was climate-controlled, his affidavits show there is an issue of fact as to whether he actually made representations to the Plaintiffs that the warehouse was climate-controlled. [Doc. # 99, ¶ 10]. He denies making any verbal statements concerning the warehouse, and the Defendant has created a sufficient issue of fact whether the version of the website furnished by the Plaintiffs was even in existence in 2011 when the Plaintiffs were deciding on a flooring contractor. [Doc. # 99-1, Ex. 1A]. A false representation made recklessly as a positive assertion with the intent to deceive the recipient can be sufficient to support a claim for fraud under both North Carolina law and 11 U.S.C. § 523(a)(2). Cf. Sandberg v. Virginia Bankshares, Inc., 979 F.2d 332, 345 (4th Cir.1992) ("A tort action for deceit requires proof of scienter . . . which is satisfied where a party acts with conscious disregard of whether a representation is true."), vacated on other grounds, 1993 WL 524680 (4th Cir.1993). If the Defendant did in fact make the representation with no

knowledge of its veracity with the intent to entice the Plaintiffs into a contract, a false representation may be found. The Defendant denies making this verbal representation, has shown that the website evidence admitted by the Plaintiffs is not representative of the time period in which they were conducting their due diligence on the Defendant, and has shown through evidence where he invited the Plaintiffs to come visit the warehouse, tending to negate any attempt to hide the truth from the Plaintiffs. Moreover, even if untrue, there is insufficient evidence from which the Court could conclude that this statement was sufficiently material to support a claim for fraud. These are issues for trial.

### 4. Representation Made with Intent to Deceive

With respect to the third element, intent to deceive, "a debtor will be found to have acted with the requisite intent to defraud under Section 523(a)(2)(A) when, at the time the transaction occurred, it is established that the debtor, for [ ] personal gain, knowingly [misled] the investor as to a material fact concerning the [debt]." In re Peak, No. 12-01424-8-ATS, 2013 WL 4478954, at *3 (Bankr. E.D.N.C. Aug. 20, 2013) (quoting In re Cox, 2012 WL 6681805 at *3 (Bankr. E.D.N.C. Dec. 21, 2012)). The defendant's intent may be inferred from his false representation, but courts are unlikely to grant summary judgment in a situation where intent must be inferred in order to be proven, as such findings are factual determinations. In re Coles, No. 02-52908, 2003 WL 22399721, at *3 (Bankr. M.D.N.C. Oct. 14, 2003) (quoting United States v. Earhart (In re Earhart), 68 B.R. 14, 17 (Bankr.N.D.Iowa 1986) ("[i]t is highly unlikely that a situation would ever arise under which summary judgment would be appropriate in [an] adversary proceeding brought under section 523(a)(2).")). The Plaintiffs ask the court to infer intent, which is a question of fact and credibility in this case, and summary judgment is therefore inappropriate.

Responding to every alleged misrepresentation, the Defendant has either argued that he never uttered the alleged verbal misrepresentations or any representations were not intended to mislead the Plaintiffs. The Defendant denies making any representation about the age of the business with the intent to induce the Plaintiffs into believing he had owned and operated it since 1976. Instead, the Defendant states his intention was to convey the amount of time he individually had been in the wood business. [Doc. # 99, ¶ 1]. Moreover, the Defendant has established an issue of fact with respect to whether the version of the website upon which the Plaintiffs contend they relied even was in existence at a time prior to the commencement of the work on their Property. If it were not, the Defendant could not have intended to deceive them by a statement that he had not even made yet. Construing the evidence in a light most favorable to the Defendant, this dispute also creates an issue with respect to whether the Plaintiffs relied upon any version of the website. If the Defendant proves that the website upon which the Plaintiffs have testified they relied did not even exist at the relevant time, the Court will have to determine the credibility of any testimony that the Plaintiffs saw or relied upon any statement from the website.

### 5. Justifiable Reliance on the Representation

Section 523(a)(2)(A) requirements are determined under common law principals. <u>Field</u>, 516 U.S. at 71. Justifiable reliance, a subjective standard taking into account the relationship of the parties, is the standard of reliance required under Section 523(a)(2)(A). <u>Field v. Mans</u>, 516 U.S. at 443-444; <u>In re White</u>, 128 F. App'x 994, 1002 (4th Cir. 2005).

Construing the facts in a light most favorable to the Defendant, the Plaintiffs have not established that they actually relied on alleged misrepresentations such that they would have not otherwise hired the Defendant or made the same wood choices. Whether any actual reliance also was justifiable is similarly in dispute. The Plaintiffs state they were justified in relying on a

28

person who appeared to have requisite knowledge and experience in flooring.  [Doc. # 91, ¶ H.].  As discussed above, however, the Friedmans had numerous occasions as the general contractor to view the climate-controlled warehouse and to view the Corn House indicative of the Defendant's past workmanship.  The Friedmans were provided with information concerning the difficulty in working with Canadian Maple.  Finally, construed in a light most favorable to the Defendant, the facts of this case demonstrate not only that the Friedmans expressed concern or disappointment in the Defendant's past work, but that their disappointment led them to be distrustful of the Defendant even during their pre-project discussions.  [Doc. # 99-1, Ex. 4].  In any event, the Court cannot conclude for purposes of summary judgment that the Plaintiffs actually or justifiably relied upon any of the purported statements.

### 6.  **Loss as a Proximate Result of its Reliance**

Damages are legally caused by a misrepresentation only if those pecuniary losses are within the foreseeable risk of harm that it creates.  In re Lovato, 442 B.R. 810, 815 (Bankr. D.N.M. 2011) (citing Restatement (Second) of Torts § 548A (1977)).  "A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance." Id.

There is a material issue of fact as to whether any of the alleged damages are the result of Defendant's alleged misrepresentations. Plaintiffs claim that shortly after SFP installed the hardwood flooring, they noticed what appeared to be defects in the flooring, including large gaps in installation, flexing and movement in the flooring, defects in milling of the wood, and other defects in the flooring and its installation.  [Doc. # 90, Friedman Affidavit, ¶ 32].  The Plaintiffs then hired two different inspectors to make assessments of the flooring.  They allege that the inspections show that the flooring installed was of inferior quality, mismilled, and not installed according to industry standards.  [Doc. # 90, Friedman Affidavit, ¶ 36].  As evidence, the

Plaintiffs offered the inspection from George L. Palmer, which determined gaps were from poorly milled wood, and that creaking and moving of the flooring were due to faulty fastening schedules that do not meet standards.  [Doc. # 4, Ex. F].  Plaintiffs also submitted the inspection performed by Tucks Floor Service, which concluded the wood flooring installed was not select quality and was not installed by industry standards.  [Doc. # 4, Ex. F].  However, Defendant offered an inspection from Consult Inspect Design, Inc., that indicated the project appeared incomplete – the mismilled wood made up less than 5% of the wood used, and any problems appeared to be a result of the failure of the Plaintiffs to correctly monitor the environment of installation.  [Doc. # 99, Ex. 9].   The Consult Inspection also provides evidence that the materials used had met the quality standard of wood promised.  These opposing inspection conclusions raise a material issue of fact.

For these reasons, the Court will need to evaluate at trial the credibility of the inspections as well as the underlying causes of the alleged damages in order to make a determination that there have in fact been damages that arose as a result of the reliance on any alleged misrepresentation.

## CONCLUSION

The Plaintiffs and Defendant have entered into an oral contract, the terms of which are unclear and disputed.  Both parties significantly disagree as to the material agreed to be used in the Property.  Both parties also dispute whether numerous verbal representations were made and have significantly different accounts of interactions among the parties occurring before, during, and after their agreement to work together.  For the reasons set forth herein, this matter is inappropriate for summary judgment.

THEREFORE, it is HEREBY ORDERED, ADJUDGED, and DECREED that the Motion for Summary Judgment is DENIED.

[END OF DOCUMENT]